John Paul Riddle v. Commissioner.
Riddle v. Commissioner
Docket No. 24657.
United States Tax Court
1953 Tax Ct. Memo LEXIS 394; 12 T.C.M. (CCH) 44; T.C.M. (RIA) 53024; January 29, 1953
Benj. W. Turner, Esq., for the petitioner. Newman A. Townsend, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: This proceeding contests a deficiency of $48,546.65 in income tax determined for the year 1943. The year 1942 is involved because of the provisions of the Current Tax Payment Act of 1943. The only question is whether the assets of a partnership of which petitioner was a member should be depreciated over a life of five years as determined by respondent or over a two-year period as claimed by the partnership. Findings of Fact During 1943 petitioner held a 50 per cent interest in a partnership (hereafter called the partnership) known as Riddle-McKay Aero College. The partnership and the petitioner filed their tax returns for 1943 with *395 the collector for the district of Florida. Petitioner learned to fly in the United States Army Air Force in 1922. He gained extensive experience in flying, the sale of airplanes, the instruction of pilots and later the petitioner became a vice president of American Airlines. This connection was severed in 1934 and the petitioner then went to Florida to operate a chartered airplane service. In 1939 he organized a company to train student pilots. Early in 1941 the petitioner was introduced to a representative of the British Government, Air Marshal Carnegie, by General H. Arnold of the United States Army Air Force. Carnegie was in the United States for the purpose of opening schools to train candidates for the Royal Air Force. Early in 1941 Carnegie and the petitioner made an aerial survey around Lake Okeechobee, Florida and selected a site for such a training school about six miles west of Lake Okeechobee and Clewiston, Florida. The site was about 2,600 acres in area. Some of it was held by the State of Florida for non-payment of taxes. The partnership purchased the whole site for $25,541. The surrounding land was partially used for grazing but portions of it were not being put *396 to any commercial use at all. A factor influencing the choice of the area was that it was clear of commercial airways and was distant from any centers of population. For drainage and irrigation purposes it was necessary to build a dike around the field and install pumps and drainage facilities. The design of the field was unusual in that the buildings were in the center and the runways bordered the field. The buildings at the airfield were constructed of concrete block and the runways were of asphalt and concrete construction. The hangars were made of sheet metal and steel. The life of the permanent installations at the field would ordinarily be more than two years. On August 1, 1941, a formal partnership was formed in which petitioner had a 50 per cent interest and J. G. McKay, Sr., and J. G. McKay, Jr. had 30 per cent and 20 per cent interests, respectively. This partnership continued until August 1944 when the petitioner withdrew as a partner. On June 1, 1941, a contract had been entered into on behalf of the partnership, hereinafter referred to as Contract A, with the British Government under which the partnership was to train from 200 to 250 students at a time for the Royal *397 Air Force. The last class under Contract A would matriculate on April 30, 1942 and graduate in October 1942. A training course required from 22 to 28 weeks to complete. In early 1942, because of the financial situation of Great Britain it was necessary for the United States Army Air Force to supplement Contract A with an interim contract, hereinafter referred to as Contract B, from April 1, 1942 until June 30, 1942. The last class under Contract B would graduate in January 1943. Contracts A and B were cancelable without cause on 30 days' notice. On or about August 8, 1942, the partnership entered into another contract, hereinafter referred to as Contract C, with the United States Army Air Force. Under this contract the first class of students would matriculate August 7, 1942, and the last class about June 30, 1943. The last class would graduate in January of 1944. One other contract was entered into while the petitioner was a member of the partnership. The partners expected that other contracts would be entered into following Contract A, but based upon what they conceived the world situation to be and the conversations they had with representatives of the British Government *398 they reasonably thought that flight training would not last more than two years. The auditors of the partnership were directed to depreciate the cost of the airfield and its facilities over a two-year period. Because the partners felt that five years was too long a period for depreciation under the circumstances, no application for permission to amortize the permanent installation over a five-year life as required by section 124 of the Internal Revenue Code was made. The amount of depreciation claimed by the partnership and the amount as allowed by respondent in determining the petitioner's share of the partnership income for 1942 is as stated below: Depreciation claimed per return
$473,343.50
Depreciation allowed: Equipment
28,973.40
Assets sold
106,064.09
135,037.49
Depreciation disallowed
$338,306.01
In the late summer of 1942 the partnership began negotiations with the Defense Plant Corporation, a Government corporation, leading to the sale of the pilot training school. The partnership was not anxious to sell because it had a profitable operation. The contract of sale was executed September 1, 1942, and the actual conveyance *399 took place December 10, 1942. At the time of sale the partnership had a contract to train pilots that had not been fulfilled. The partnership expected to fulfill this contract which did not expire until the end of 1943. After the sale the partnership continued to operate the airfield under lease until September 1945, although the partners had no reason to believe at the time they undertook the original construction of the project that operations would extend that long. The ordinary net income and the gain or loss on the sale of the school facilities as computed by the partnership (2) and as determined by respondent (1) is as stated below: Ordinary
Gain or Loss
Net Income
on Sale of Assets
(1)
$270,450.76
($ 99,330.71)
(2)
51,624.41
104,737.08
The loss on the sale of assets to the Defense Plant Corporation as determined by respondent was computed as follows: Cost of assets sold per amended
return
$908,545.03
Less: Depreciation
allowed -
1941
None
1942
$106,064.09
106,064.09
Adjusted basis
802,480.94
Net sales price per amended return
703,150.23
Net loss
$ 99,330.71
In computing depreciation on the assets *400 sold to the Defense Plant Corporation respondent used an estimated life of 60 months and allowed a salvage value of ten per cent. If depreciation is computed on a life of 30 months or more, the deficiency as asserted in the statutory notice will remain unchanged. The airfield would not have been useful after the cessation of hostilities. Opinion We treat the question as one of fact. The burden is on the petitioner to show respondent's determination was wrong and to give the Court evidence from which a proper determination can be made. Lightsey v. Commissioner, (C.A. 4) 63 Fed. (2d) 254. The petitioner has met this burden, in our opinion, and we think the two-year basis for depreciation was properly claimed. Admittedly, the project on which the partnership embarked was a risky business. The useful economic life of the training field on the facts of the case was tied in with the period of hostilities. It would have had no use after the end of that period. There was testimony tending to show that most of the training fields operated on the same basis as this one was in this country had actually been closed down prior to the end of the war. That the field in question *401 was one of the last to be abandoned was to a large extent fortuitous. The original contracts for pilot training were cancelable without cause on 30 days' notice. No one knew how long the war would last and we think we can take judicial notice of the contrariety of guess and opinion that existed in that respect during the years here under consideration. The British officials with whom petitioner was dealing thought the training program would last about two years. The petitioner is not called on to prove with certainty the cost of obsolescence or of accruing exhaustion, wear and tear that is properly chargeable in any period. The Supreme Court has said, "Such weight of evidence as would reasonably support a verdict for a plaintiff in an ordinary action for the recovery of money fairly may be deemed sufficient." Burnet v. Niagara Falls Brewing Co., 282 U.S. 648. Despite the fact that the witnesses for the petitioner were his partner and himself we can find no sound reason for disregarding that testimony. Both men were well grounded in their business and no complicated questions calling for expert opinions are presented. The petitioner has produced sufficient evidence *402 to support a determination that a two-year period for depreciation was proper. As a matter of hindsight, the field was actually useful over a 44-month period. The respondent allowed a 60-month depreciation period and the petitioner claimed a 24-month period. No change in the deficiency as determined would occur unless a period of 30 months or longer is adopted. The agent who originally set up the 60-month period on which the deficiency is based testified he did so because that was the shortest period that would have been allowable had the partnership applied for a certificate of necessity. This determination does not appear to have been based on any facts with reference to the useful economic life of the pilot training project. We hold for petitioner on this issue. Decision will be entered under Rule 50.